# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

_____

John Agenbroad, Marty Hallberg, Robert Miller, Michael Sippy,
Patrick LoPresti, George Osgood, Douglas Brown, Kurt Freeman,
Byron Austin, Martin Callaghan, Christopher Farrand, Paul
Mancillas, Steven Nobles, Edward Williams, and Brian Earl, as
Trustees of the Inter-Local Pension Fund of the Graphic
Communications Conference of the International Brotherhood of
Teamsters,

Civil File No. _____

                Plaintiffs,

**COMPLAINT**

    v.

SCHUSTER GRAPHICS, INC., a Minnesota corporation, d/b/a
Technagraphics, Inc., and d/b/a Techna Graphics; and John L.
Schuster,

                Defendants.
_____

      John Agenbroad, *et al*, as Trustees of the Inter-Local Pension Fund of the Graphic Communications

International Union ("the Fund"), the Plaintiffs above-named, for their Complaint against Defendants in

this matter, state and allege as follows:

## PARTIES AND JURISDICTION

1.      Co-Defendant SCHUSTER GRAPHICS, INC., d/b/a Technagraphics, Inc., and d/b/a Techna

      Graphics ("Technagraphics"), is a Minnesota Corporation, and its registered office address is

      6500 West Lake Street, St. Louis Park, MN 55426.

2.      Upon information and belief, Co-Defendant John L. Schuster is Technagraphics' Chief

      Executive Officer and Chairman of the Board of Directors, and he resides at 2426 Bantas Point

Lane, Wayzata, MN 55391.

3.  Plaintiffs are trustees and fiduciaries of the Fund, which is a defined benefit pension plan, as that term is defined in 29 U.S.C. §1002(2)(a) ("E.R.I.S.A."), for members of participating local unions of the Graphic Communications Conference of International Brotherhood of Teamsters ("International Union"). The Fund is a trust established under Illinois law, and is tax exempt under §501(c)(18) of the Internal Revenue Code.

4.  Jurisdiction of this action is based upon 29 U.S.C.  §1132(f) and 28 U.S.C. §1331.

## COUNT ONE:

## BREACH OF COLLECTIVE BARGAINING AGREEMENT

5.  Plaintiffs reassert and reallege the allegations set forth in paragraphs 1 through 4 above.

6.  Technagraphics is signatory to a Collective Bargaining Agreement with the Graphic Communications Conference of International Brotherhood of Teamsters Local 1-M ("Local Union") effective January 1, 2004 through December 31, 2007. Technagraphics and the Local Union have not bargained a new Collective Bargaining Agreement to impasse, and the terms and conditions of that contract remain in effect under 29 U.S.C. §185(a)(5) ("National Labor Relations Act").  That attached hereto and labeled as Exhibit A is a copy of the Collective Bargaining Agreement.

7.  All contributions to the Fund are made by individual participants out of their wages.  No employer can, or does, make contributions to the Fund.  Pension benefits are based on the amount of the individual participants' contributions received by the Fund.

8.  The Local Union is the exclusive collective bargaining representative of the Technagraphics employees ("Union Employees").  As a result of their membership in the Local Union, these Union Employees are Fund participants.

9.     Pursuant to **ARTICLE 7 – PENSION FUND**, page 4 of the Exhibit A Collective Bargaining Agreement, Technagraphics agreed to accept Pension Fund Authorizations from its Union Employees to withhold a percentage of their wages to be forwarded on their behalf to the Local Union.  The current rate is six percent (6%).  In turn, the Local Union forwards these withheld wages to the Fund for appropriate crediting to the employees' accounts with the Fund.

10.    Since January 2008, Technagraphics withheld amounts from the wages of its Union Employees to be forwarded to the Local Union under Article 7 of the Collective Bargaining Agreement and the Pension Fund Authorizations signed by the Union Employees.

11.    Despite its obligations under the Collective Bargaining Agreement and the Pension Fund Authorizations, Technagraphics has not forwarded to the Local Union or to the Fund the contributions, which it withheld from the wages of its Union Employees.

12.    In spite of Plaintiffs' and the Local Union's demands, Technagraphics has refused to forward the amounts withheld from its Union Employees' wages to the Local Union or the Fund.

13.    The moneys withheld by Technagraphics from the wages of its Union Employees are not the property of Technagraphics, but are the Union Employees' wages which were paid to them. These amounts were reported by Technagraphics to the Internal Revenue Service and the State of Minnesota as wages paid to Union Employees.  These wage payments were withheld from the paychecks of the Union Employees for the sole purpose of being promptly forwarded to the Local Union and the Fund as the Union Employees' contributions to the Fund.

14.    Technagraphics did not have the consent of the Union Employees to retain any of the above-referenced withheld wages.

15.    Technagraphics' exercise of control over, the above-referenced withheld wages was and is an unauthorized, wrongful, and intentional exercise of control of, and dominion over, the Fund's assets.

- 3 -

16.     Technagraphics has breached the Collective Bargaining Agreement and violated 29 U.S.C.
        §1145 by not submitting the Union Employees' contributions to the Local Union.

17.     Pursuant to 29 U.S.C. §1132(g)(2)(C), Technagraphics is liable to Plaintiffs for liquidated
        damages in the amount of twenty (20%) percent of the unpaid contribution amount.

18.     Pursuant to the Collective Bargaining Agreement and 29 U.S.C. §1132(g)(2)(B),
        Technagraphics is liable to Plaintiffs for interest in the unpaid contributions at the rate provided
        in 26 U.S.C. §6621 (§6621 of the Internal Revenue Code).

19.     Pursuant to the Collective Bargaining Agreement and 29 U.S.C. §1132(9)(2), Technagraphics
        is liable to Plaintiffs for Plaintiffs' reasonable attorney fees and costs.

## COUNT TWO:

## IMPOSITION OF CONSTRUCTIVE TRUST

20.     Plaintiffs reassert and reallege the allegations set forth in Paragraphs 1 through 19 above.

21.     By its wrongful possession and use of the above-described withheld Union employees' wages,
        Technagraphics realized and will continue to realize benefits.

22.     Technagraphics' wrongful and intentional acquisition, possession, and use of the above-
        described withheld wages have damaged and caused irreparable harm to the Fund and to its
        Union Employees.

23.     In the interests of equity, the Court should impose a constructive trust, for the Plaintiffs'
        benefit, over all revenues, profits, and other benefits realized by reason of Technagraphics'
        acquisition, use, and possession of the withheld wages of its Union Employees.  The amount of
        the trust is yet to be determined.

**COUNT THREE:**

**BREACH OF FIDUICIARY DUTY**

24.     Plaintiffs reassert and reallege the allegations set forth in paragraphs 1 through 23 above.

25.     As Technagraphics' officer and director, Co-Defendant John L. Schuster has the authority to make financial decisions for Technagraphics, including whether to forward the above-referenced withheld wages to the Local Union for transfer to the Fund on behalf of the Union Employees.

26.     Pursuant to 29 C.F.R.§2510.3-102(a):

> General Rule.  For purposes of subtitle A and parts 1 and 4 of subtitle B of title I of ERISA and section 4975 of the Internal Revenue Code only…the assets of a plan include amounts…that a participant or beneficiary pays to an employer, ***or amounts that participant has withheld from wages by an employer,*** for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.

(Emphasis added).  The amounts withheld by Technagraphics from its Union Employees' wages are Fund assets.

27.     Pursuant to 29 U.S.C. §1002(21)(A), co-Defendant John L. Schuster has become a fiduciary of the Fund by virtue of his exercise of management and control over the Fund's assets.

28.     Pursuant to 29 U.S.C. §1002(21)(A), co-Defendant John L. Schuster, as corporate officer, has become a fiduciary of the Fund by virtue of his exercise of discretionary administrative control over plan assets.

29.     Pursuant to 29 U.S.C. §1104 (a)(1), co-Defendant John L. Schuster has a fiduciary duty to act with care, skill prudence and diligence solely on behalf of the Fund's participants, i.e., to segregate plan assets from Technagraphics' property and send them to Plaintiffs.

30.     Pursuant to 29 U.S.C. §1104, co-Defendant John L. Schuster breached and continues to breach his fiduciary duty to the Fund and the Union Employees by failing to send withheld wages to

the Local Union for transfer to the Fund.

31.     Plaintiffs, as Trustees of the Fund and as plan fiduciaries, under 29 U.S.C. §1132(a)(2), bring

this suit for equitable relief for the breach of fiduciary duty by Defendant John L. Schuster,

specifically to affirmatively enjoin him to send to the Fund forthwith all withheld wages of the

Union Employees.

32.     Defendants are liable to Plaintiffs for reasonable attorney fees, costs, disbursements and interest

pursuant to 29 U.S.C. §1132(g).

WHEREFORE, Plaintiffs pray for an order as follows:

1.      Granting judgment in favor of Plaintiffs and against Defendant Technagraphics for delinquent

contributions together with interest, liquidated damages reasonable attorney fees, and fees and

costs.

2.      Granting equitable relief in the form of imposing a constructive trust over all revenues, profits

and other benefits realized by reason of Technagraphics' acquisition, use and possession of the

withheld wages of its Union Employees.

3.      Finding Defendant John L. Schuster to be a Fund fiduciary, and that Defendant John L.

Schuster has breached his fiduciary duty by failing to remit Plan assets to the Fund.

4.      Granting such other relief as the Court deems just and equitable.

                                        ROSENE, HAUGRUD & STAAB, CHARTERED


Dated:  October 2, 2008                 s/ Andrew E. Staab
                                        Andrew E. Staab
                                        Attorneys for Plaintiffs
                                        400 Robert Street North, Suite 1800
                                        St. Paul, MN  55101
                                        (651) 227-6621
                                        Attorney Registration #204705

# CONTRACTUAL AGREEMENT

By and Between

# TECHNAGRAPHICS, INC.

and

# GRAPHIC COMMUNICATIONS INTERNATIONAL UNION UPPER MIDWEST LOCAL 1-M, AFL-CIO

Effective

January 1, 2004 through December 31, 2007



**EXHIBIT**

A

## TABLE OF CONTENTS

Page

ARTICLES OF AGREEMENT.................................................................................................. 1
ARTICLE 1 - RECOGNITION ............................................................................................... 1
ARTICLE 2 - JURISDICTION ............................................................................................... 1
ARTICLE 3 - CERTIFICATION OF ELECTIONS ................................................................ 2
ARTICLE 4 - UNION SHOP ................................................................................................. 2
ARTICLE 5 - HIRING OF HELP AND UNION ACCESS TO PLANT ................................ 2
ARTICLE 6 - WAGE SCALE ................................................................................................ 3
ARTICLE 7 - PENSION FUND ............................................................................................. 4
ARTICLE 8 - GCIU SUPPLEMENTAL RETIREMENT AND DISABILITY FUND ............. 4
ARTICLE 9 - APPRENTICES ............................................................................................... 5
ARTICLE 10 - FEEDERS ...................................................................................................... 6
ARTICLE 11 - HELPER DUTIES .......................................................................................... 6
ARTICLE 12 - NEW MACHINES AND PROCESSES ......................................................... 7
ARTICLE 13 - MANNING OF PRESS .................................................................................. 7
ARTICLE 14 - WORK WEEK .............................................................................................. 11
ARTICLE 15 - OVERTIME .................................................................................................. 12
ARTICLE 16 - ELECTRONIC SCANNERS ........................................................................ 13
ARTICLE 17 - PAID HOLIDAYS ....................................................................................... 13
ARTICLE 18 - PART OF A DAY'S COMPENSATION ...................................................... 14
ARTICLE 19 - NOTICE OF LAYOFF OR DISCHARGE ................................................... 14
ARTICLE 20 - COMPENSATION FOR LAYOFF .............................................................. 15
ARTICLE 21 - VACATIONS ............................................................................................... 16
ARTICLE 22 - LEAVES OF ABSENCE .............................................................................. 18
ARTICLE 23 - SAFETY AND HEALTH CONDITIONS ..................................................... 19
ARTICLE 24 - HEALTH AND WELFARE .......................................................................... 20
ARTICLE 25 - STRUCK WORK .......................................................................................... 20
ARTICLE 26 - CHAIN SHOP .............................................................................................. 20
ARTICLE 27 - RIGHT TO TERMINATE ............................................................................ 21
ARTICLE 28 - TRADE SHOP AND OUTSIDE WORK ..................................................... 21
ARTICLE 29 - FOREIGN WORK ....................................................................................... 21
ARTICLE 30 - INDIVIDUAL RIGHT OF EMPLOYEE ...................................................... 21
ARTICLE 31 - IDENTIFICATION OF WORK .................................................................... 21
ARTICLE 32 - PIECE WORK AND BONUS SYSTEM ...................................................... 22
ARTICLE 33 - DIVISION OF WORK ................................................................................. 22
ARTICLE 34 - SENIORITY ................................................................................................. 23
ARTICLE 35 - NO TRANSFER OF EQUIPMENT ............................................................. 25
ARTICLE 36 - CONTINUITY OF AGREEMENT ............................................................... 25
ARTICLE 37 - NO STRIKE - NO LOCKOUT..................................................................... 25
ARTICLE 38 - ARBITRATION PROCEDURE .................................................................... 25
ARTICLE 39 - SHOP CHAIR .............................................................................................. 27
ARTICLE 40 - PUBLICATIONS .......................................................................................... 27
ARTICLE 41 - TECHNOLOGICAL DEVELOPMENTS ..................................................... 28
ARTICLE 42 – MANAGEMENT RIGHTS .......................................................................... 28
ARTICLE 43 - SEPARABILITY .......................................................................................... 28
ARTICLE 44 - NO ORAL OR IMPLIED AGREEMENT..................................................... 29
ARTICLE 45 - SUPERINTENDENTS AND FOREPERSONS ............................................. 29
ARTICLE 46 - DELINQUENT LIABILITY ......................................................................... 29
ARTICLE 47 - INTERNATIONAL APPROVAL ................................................................. 29
ARTICLE 48 - LENGTH OF CONTRACT........................................................................... 29
JOURNEY WAGE SCALE................................................................................................... 31

## INDEX

Page

APPRENTICES ........................................................................................................ 5
ARBITRATION PROCEDURE ............................................................................... 25
ARTICLES OF AGREEMENT ................................................................................. 1
CERTIFICATION OF ELECTIONS ......................................................................... 2
CHAIN SHOP ......................................................................................................... 20
COMPENSATION FOR LAYOFF .......................................................................... 15
CONTINUITY OF AGREEMENT ........................................................................... 25
DELINQUENT LIABILITY ................................................................................... 29
DIVISION OF WORK ............................................................................................ 22
ELECTRONIC SCANNERS ................................................................................... 13
FEEDERS ................................................................................................................. 6
FOREIGN WORK ................................................................................................... 21
GCIU SUPPLEMENTAL RETIREMENT AND DISABILITY FUND ..................... 4
HEALTH AND WELFARE ..................................................................................... 20
HELPER DUTIES ..................................................................................................... 6
HIRING OF HELP AND UNION ACCESS TO PLANT ........................................... 2
IDENTIFICATION OF WORK ............................................................................... 21
INDIVIDUAL RIGHT OF EMPLOYEE ................................................................. 21
INTERNATIONAL APPROVAL ............................................................................ 29
JOURNEY WAGE SCALE ...................................................................................... 31
JURISDICTION ........................................................................................................ 1
LEAVES OF ABSENCE ......................................................................................... 18
LENGTH OF CONTRACT ..................................................................................... 29
MANAGEMENT RIGHTS ..................................................................................... 28
MANNING OF PRESS ............................................................................................. 7
NEW MACHINES AND PROCESSES ..................................................................... 7
NO ORAL OR IMPLIED AGREEMENT ............................................................... 29
NO STRIKE - NO LOCKOUT ................................................................................ 25
NO TRANSFER OF EQUIPMENT ......................................................................... 25
NOTICE OF LAYOFF OR DISCHARGE ............................................................... 14
OVERTIME ............................................................................................................ 12
PAID HOLIDAYS .................................................................................................. 13
PART OF A DAY'S COMPENSATION .................................................................. 14
PENSION FUND ....................................................................................................... 4
PIECE WORK AND BONUS SYSTEM .................................................................. 22
PUBLICATIONS .................................................................................................... 27
RECOGNITION ........................................................................................................ 1
RIGHT TO TERMINATE ....................................................................................... 21
SAFETY AND HEALTH CONDITIONS ................................................................ 19
SENIORITY ............................................................................................................ 23
SEPARABILITY ..................................................................................................... 28
SHOP CHAIR ......................................................................................................... 27
STRUCK WORK ..................................................................................................... 20
SUPERINTENDENTS AND FOREPERSONS ....................................................... 29
TECHNOLOGICAL DEVELOPMENTS ............................................................... 28
TRADE SHOP AND OUTSIDE WORK ................................................................. 21
UNION SHOP ........................................................................................................... 2
VACATIONS .......................................................................................................... 16
WAGE SCALE .......................................................................................................... 3
WORK WEEK ......................................................................................................... 11

Effective January 1, 2004 through December 31, 2007

GCU Upper Midwest Local 1-M, AFL-CIO

and

Technagraphics, Inc.

## ARTICLES OF AGREEMENT

These articles of agreement entered into this 1st day of January, 2004 by and between the authorized representatives of Technagraphics, Inc. whose signatures are affixed hereto, hereinafter known as the "Employer" or the "Company" and Local 1-M of the Graphic Communications International Union, an International Labor Organization, located at 684 Transfer Road, St. Paul, Minnesota 55114, hereinafter referred to as the "Union."

**WHEREAS,** the parties hereto are desirous of promoting and maintaining harmonious relations between Employer and Employees and of assuring industrial peace.

**NOW THEREFORE,** it is mutually agreed as follows:

## ARTICLE 1 - RECOGNITION

Section 1. For the purpose of collective bargaining in respect to rates of pay, hours of employment or other conditions of employment, the Employer recognizes the Union as the exclusive representative of all employees performing work described in the Jurisdictional Article of this contract.

Section 2. The Employer agrees that during the term hereof and during any negotiations for the renewal or extension hereof or for any successor contract hereto, it will not sign any contract nor make any written agreement of any kind with any other union relating to any jobs or work covered by this Agreement.

Section 3. The Employer agrees that in the event any of the job or work processes under this contract are removed from the jurisdiction of the Union by the action of the Employer, the Union may in its discretion either terminate this Agreement or reopen it in all respects with the right to strike if the parties fail to agree upon a new contract. This does not apply to Trade Shop work.

Section 4. No individual employment contracts shall be entered into unless by consent of both parties hereto.

## ARTICLE 2 - JURISDICTION

Section 1. The Employer recognizes the Union as the sole and exclusive bargaining agency for all Lithographic, Letterpress, Bindery, Shipping and Receiving employees employed by the Employer at its facility at 6500 West Lake Street, St. Louis Park, Minnesota, excluding all creative employees, salesmen, shipping and receiving employees, office clerical employees, guards, and supervisors as defined in the National Labor Relations Act, as amended and as certified in NLRB Case No. 18-RC-10473.

Owners and Partners may continue to perform unit work as in the past.

Section 2. The processes described in Section 1 above shall include without limitations all operations of the process pertaining to the production of Photoengraving plates, plates for Offset, and Gravure cylinders and plates of any substance or material from copy or from originals and/or subjects when furnished in lieu of copy up to the finished product.

Section 3. All material to be reproduced for printing purposes shall serve as copy for the camera to be processed and completed under present or future operations by employees covered by this contract.

Section 4. The terms "work, production work, equipment or process" as used in any article of this Agreement shall be construed as that work or process, or processes as described in Article 2 [Jurisdiction].

## ARTICLE 3 - CERTIFICATION OF ELECTIONS

The Employer agrees that in the event the Union files a petition for certification by the National Labor Relations Board in respect to the same group of lithographic employees who are covered by the contract the Employer will consent to any election stipulation for certification.

## ARTICLE 4 - UNION SHOP

Section 1. Non-union employees hereafter employed and present employees who are not members of the Union when this Agreement goes into effect shall apply for membership in the Union after thirty (30) days from the beginning of their employment or from the date this Agreement goes into effect, whichever is later. Any such employee who fails to do so shall be discharged within ten (10) days after written notice from the Union.

Section 2. If membership of any employee shall be terminated because of his failure to pay Union dues within ten (10) days after written notice from the Union, the Employer shall discharge such employee.

Section 3. If any employee who is an applicant for membership in the Union shall be denied membership because of his failure to pay initiation fees or dues, then within thirty (30) days after written notice from the Union, the Employer shall discharge such employee, unless within said period he shall have tendered the Union such initiation fees and dues.

## ARTICLE 5 - HIRING OF HELP AND UNION ACCESS TO PLANT

Section 1. The Employer agrees to advise the Union Office when in need of employees.

Section 2. New inexperienced employees, and employees from outside the jurisdiction of Local 1-M shall be considered probationary for the first 90 days (calendar) of employment during which period they may be dismissed without recourse to arbitration. An employee who works 45 shifts during the 90-day period shall be considered a permanent employee and shall be added to the seniority list as of date of hire. This provision shall not supersede Article 9, Section 4 [Apprentice Probationary Period] or Section 11 [Temporary Relief]. The provisions of this article shall not limit the implementation of Article 4 [Union Shop].

Employees, except those defined above as new inexperienced employees or employees from outside the jurisdiction of Local 1-M, shall be regarded as probationary employees for the first thirty (30) shifts of their

employment. During that 30-shift period, said employees may be dismissed without recourse to arbitration. After an employee has worked more than thirty successive shifts or has worked more than thirty shifts in any continuous sixty day (60-day) period, the employee shall be considered a permanent employee and shall be placed on the seniority list for the respective classification as of date of hire.

Section 3. During the life of this Agreement, the Joint Apprenticeship Committee shall study and formulate a referral procedure. Upon agreement of such procedure it shall become an addendum to this Agreement.

Section 4. The Officers of the local Union may see members on Union business during working hours on the Employer's premises, by permission of the Employer. Any such business or meeting which adversely interrupts production must be off the clock.

Section 5. The Employer and the Union are pledged to policies of employing personnel and dealing with employees on the basis of ability, qualifications and performance, with no distinction in the assignment, training, promotion, layoff or compensation of employees because of race, creed, color, religion, sex, age or national origin. The parties will observe non-discriminatory practices in the application and administration of the provisions of this Agreement.

## ARTICLE 6 - WAGE SCALE

The minimum wage scales as hereinafter provided in this Agreement shall continue during the life of the Agreement except as hereinafter provided. It is understood that employees now receiving in excess of the hourly scales shall receive the negotiated increase in addition thereto.

### ALL APPRENTICES

Increases shall be granted to all apprentices each six months in equal installments of the difference between the starting rate and the journey rate during the term of apprenticeship.

Rate Retentions: Journey workers, apprentice personnel (and permit employees with two years permit time in their classification) who have worked in a classification for forty-four (44) consecutive shifts shall retain such wage rate for a period of twenty-three (23) shifts when transferred to a lower rated job.

(a)   Rate retention shall not be applicable to permit personnel who are returned to their original classification due to the hiring of journey or apprentice personnel as provided for in Article 9, Section 11 [Temporary Relief].

(b)   Newly hired journey or apprentice personnel shall be paid in accordance with the classification at which they were hired for a minimum of twenty-three (23) shifts.

(c)   On temporary assignments to a higher rated job, they shall receive the wage applicable to such job for the time so assigned.

(d)   For the purpose of this section, wage scale classification for an apprentice is the progression scale in the classification for which the indenture applies. The wage applicable to a higher rated job shall not be less than the progression scale covering that classification. The employee's use of vacation time, paid holidays, or paid days of layoff shall not break the consecutive shift concept necessary for rate retention eligibility, but an employee must actually work forty-four consecutive shifts before attaining rate retention eligibility.

## ARTICLE 7 - PENSION FUND

Section 1. The Employer agrees to accept wage authorization from employees in favor of "Graphic Communications International Union Local 1-M Pension Fund Trustees," in the amount of six percent (6%) of earnings each week and forward in full such amounts as authorized, to the office of the Local Union. Such authorized amounts are to be forwarded not later than the 5th of each month for the preceding month.

Section 2. In the event Section 1 is deemed in the opinion of either party to be unenforceable or in violation of any state or federal law, then at the request of either of said parties the following shall be automatically substituted therefor.

Section 3. Payment of wages shall be by check in accordance with the office procedure of the Employer. Payment of the total weekly earnings shall be made in two checks to the employee, one for an amount not to exceed the amounts outlined in Section 1 above as directed in writing by the Union, and the other for the balance of the employee's earnings.

## ARTICLE 8 - GCIU SUPPLEMENTAL RETIREMENT AND DISABILITY FUND

Section 1. The Company shall pay an amount of money equal to three percent (3%) of the weekly wages earned by each employee covered by this Agreement to GCIU Supplemental Retirement and Disability Fund, hereinafter referred to as the Retirement Fund, established under an agreement and declaration of Trust administered by a Board of Trustees composed of equal numbers of Employer and Union representatives for the purpose of providing retirement, disability and/or associated benefits for employees or their beneficiaries on whose behalf payments are made by the Company and for financing the expenses and operation of the Retirement Fund.

During the term of the collective bargaining agreement, the Company's contribution rate will be adjusted as follows:
Effective 01/01/05, increase to four percent (4.0%);
Effective 01/01/06, increase to four and one-half (4.5%); and
Effective 01/01/07, increase to five percent (5.0%).

The term "wages" as used herein shall mean all moneys earned including skill premium, night shift premium, vacation, holidays and the semi-annual Cost of Living adjustments on the dates as noted in Article 6, Section 2(b) but excluding overtime.

The parties agree that participation in and coverage by the Retirement Fund may be extended to the employees of any other employer under contract with the GCIU and to the full-time employees and officers of the International Union or any of its local unions and to the full-time employees and officers of any other union entity or Employer-Union entity provided that payments are made on behalf of such employees or officers and to all others covered under the terms of the agreement and declaration of trust.

Section 2. All payments to the retirement fund shall be by check or other order for money payable to the GCIU Supplemental Retirement and Disability Fund and shall be transmitted monthly (or weekly if requested by the Trustees) to the office of the Retirement Fund. Concurrent with the payment by the Company, the Company shall submit such reports as the Trustees deem necessary for the purpose of properly administering the trust and payment of benefits. All payments by the Company required hereunder shall be due and payable within seven (7) days after the payroll period of the week or month for which such payment is required.

Section 3. If the Company is in default in making payments required under this Article for more than thirty (30) days, it shall be liable for, and agrees to pay, such legal, court and/or other cost incurred in collection proceedings and the Union may take any action it deems advisable notwithstanding other provisions of this Agreement.

Section 4. The Company agrees to be bound by the terms of the Agreement and Declaration of Trust, a copy of which is hereby acknowledged by the Company as having been received by it, establishing the aforesaid Retirement Fund, as the same may be amended from time to time, and further agrees to be bound by the rules, regulations and plans, as may be adopted by the Trustees from time to time. The Company further agrees that the Employer-designated initial and successor Trustees under the agreement and declaration of trust, as the same may be amended from time to time, are so designated as Employer Trustees on its behalf.

## ARTICLE 9 - APPRENTICES

Section 1. Apprentices may be indentured by mutual consent under the following procedures:

Section 2. Ratio: The ratio of apprentices in the Press Department shall not exceed one (1) to four (4) journey workers, with one (1) additional apprentice for each additional four (4) journey workers; in all other departments the ratio shall not exceed one (1) apprentice to five (5) journey workers with one (1) additional apprentice for each five (5) additional journey workers in the department. It is further agreed that if a greater number of apprentices are presently employed, such apprentices shall be allowed to complete their apprenticeship. In cases where the Employer may so desire, the apprentice ratio may be determined by combining the number of journey workers in the Employer's several Lithographic Departments, in which case the ratio of apprentices shall not exceed one (1) apprentice to five (5) journey workers. The term of apprenticeship shall be four (4) years for press workers, feeder operators, and imprint preparers, and five (5) years for all other departments.

Section 3. Advancement to Apprenticeship: It is further agreed that ability being equal seniority will be observed in each department in connection with placement of new apprentices on any operations, within the rules of Section 2 of this Article. An employee shall have the right to refuse the advancement. However, his/her refusal shall not prohibit him/her from future opportunities for advancement, as they become available. Neither the Company nor the Union shall make it mandatory for an employee to accept any advancement into apprenticeship.

General Workers will receive one (1) year's credit toward an apprenticeship as a feeder or perfecting operator, if the employee has one year of experience as a general worker.

Pressmen: Only journey feeder-operators shall become apprentice press operators on 14" x 20" presses and larger. Should the feeder operators in the department refuse advancement or there are no feeder operators to move up, journey multilith operators (duplicator) would be given the opportunity to advance.

Feeder Operator: Feeder operator apprentices must be chosen from the helper classification unless by mutual consent.

Section 4. Probationary Period: There shall be a probationary period of six (6) months for apprentices in the press department and a probationary period of one (1) year in all other departments during which probationary period the employee may be discharged by the Employer without any right of arbitration. After the probationary period in the classification, apprentice press operators, apprentice feeder-operators and imprint preparers shall serve three and one-half (3½) years, and all other apprentices shall serve four (4) years before qualifying as journey workers.

Section 5. Indenture: If during the probationary period the apprentice shows aptitude indicating qualifications which will enable said apprentice to become a competent journey worker, then said apprentice shall be indentured under the Standards of the State of Minnesota and the Twin City Joint Graphic Communications Apprenticeship Committee.

Section 6. Schooling: Apprentices shall be required to attend such classes or take such related training as directed by the Twin City Joint Graphic Communications Apprenticeship Committee.

Section 7. Work: The Employer agrees that any apprentice designated by the Committee to attend such school shall not be required to work overtime on the evenings that he/she is required to attend school, and that in the event any apprentice designated by the Committee to attend school refuses to attend regularly except for good cause, his/her case shall be referred to the Joint Apprenticeship Committee.

Apprentices regularly scheduled to work night shifts shall not be required to attend school until such time as provision can be made for day classes.

Section 8. Training: The apprentice shall not be required to do chores and miscellaneous work which is not related to his/her branch of trade and which interferes with his/her apprenticeship training except by mutual consent of both parties.

Section 9. Wages: In instances where an apprentice has served part of his/her time, then the difference between the wage which the apprentice is receiving and the minimum wage scale paid to journey workers in the branch he/she is apprenticed to, be equally divided so that the rate of wage increases which he/she shall receive every six months will bring his/her wage rate up to the journey minimum wage scale existing in his/her branch of the trade. Whenever an Offset Feeder Operator is promoted to the position of operating an offset press, except on presses 17" x 22" and smaller either as an apprentice or temporarily in an emergency, then he/she shall immediately receive $5.00 per week wage increase.

Section 10. Temporary Relief: Should it be necessary to place non-journey or non-apprentice employees temporarily on any operation such placement shall be made only by agreement of the Union. The starting rate for permit personnel shall be at least 20% of the difference of the employee's present wage rate for his/her regular classification and the journey wage rate in the new classification. In instances where the employee has not been previously employed in the Company, the permit rate shall be at least 20% of the difference between the apprentice starting rate and the journey rate in the classification. (Such agreement to place personnel will be terminated by written notification from the Union which shall be served upon the availability of journey workers and/or apprentice personnel.)

## ARTICLE 10 - FEEDERS

Transfer: Whenever a single-color feeder operator is transferred to a "multi-color" feeder operation, then such feeder operator shall receive the wage scale rate specified for such classification beginning the first day from date of such transfer.

## ARTICLE 11 - HELPER DUTIES

Section 1. Press: The duties of a helper in the pressroom shall be as follows: Handle stock as necessary, wash up the presses, load the feeder and clean out part of the presses or area around the presses as the press operator or foreperson may direct. He/She will not set the feeder for sheet size changes or perform duties that are primarily the duties of a duly apprenticed feeder operator except in emergency, in which event the Shop Chair shall be notified.

Section 2.  Preparatory Department: Clean any equipment and area around such equipment. File plates and negatives or positives used in the department.  Make blueprints, pre press proofs and deliveries. He/She shall not flow or develop plates, or do opaquing, stripping or do other duties primarily the duties of a duly apprenticed lithographer except in emergency in which event the Shop Chair shall be notified.

## ARTICLE 12 - NEW MACHINES AND PROCESSES

Section 1.  The Employer agrees that in the event of the installation of new or improved machines or processes for production work not used by the Employer prior to the contract effective date such machines or processes must be operated under this contract and under a scale of wages and conditions of work agreed upon by a joint committee of four (4) members, two of whom shall be selected by the Employer and/or the Association and two to be selected by the Union.  Unless otherwise mutually agreed the initial operation of such machines or processes shall be performed by journey workers.  The wage rates, unless otherwise mutually agreed when finally adopted, shall be retroactive to the date of commercial production on such equipment or processes.

Section 2.  The Employer agrees to give the Union and the Association a ninety day (90-day) notice or notice upon the date of purchase, whichever is the lesser, prior to the installation of new type lithographic press equipment.  Likewise the Employer agrees to give reasonable written notice prior to the installation of any new type equipment or processes and to meet promptly after such notice upon request for consideration of wage scales and working conditions for such machines or processes.  Such equipment or processes shall not be operated until the Employer has complied with the required notice.

Section 3.  The Employer agrees that it will not change its present methods of production if such change affects the employment of employees under this Agreement before giving ninety (90) days notice of such proposed change to the Union in order that the parties may meet to consider what other related changes may be required.  Immediately upon mutual agreement, changes may become effective.  If the parties cannot agree they shall proceed to determine the difference by arbitration.  Process changes shall not hold up the effective date of any proposed change if present employment is not affected.  Change in method as used herein shall include process changes as well as complete component or department termination made in favor of subcontracting.

## ARTICLE 13 - MANNING OF PRESS

No person shall be permitted to run more than one press at a time.  A press complement shall be composed of the following except in cases of emergency, in which case the Shop Chair shall be notified.

### SHEET FED EQUIPMENT

#### SINGLE COLOR PRESSES

(a)    Single color presses 17" x 22" through 36" inclusive - one journey press operator.

(b)    Single color presses OVER 36" - one journey press operator, one journey feeder operator.

#### TWO COLOR PRESSES

(c)    Two color Multilith-Davidson - one journey Multilith Davidson operator.

(d)    Through 26" - one press operator.

(e)   27" through 30" - one press operator, one feeder, or one feeder between two presses;  when operating with one feeder between two presses, the following hourly increase will be paid: $.32 per hour; feeder assigned $.17 per hour in addition to the hourly  rate specified for a 2-worker complement).

(f)   31" through 40" - one press operator, one feeder. **

(g)   41" through 50" - one press operator, one feeder and adequate floor help.

(h)   51" and over - one press operator, one feeder, one helper.

**  Two color 40" crews shall be paid at the 2-color 38" rate.    A two color 40" employee who has been working on 40" equipment prior to June 1, 1976 will be "red circled" whenever working on 40" equipment for the Employer, unless the employee moves off the equipment by his/her own choice.

### THREE COLOR PRESSES

(i)   Three color presses to 48" - one journey press operator, two journey feeder operators.

NOTE: The feeder position is deleted from manning on 1/c, 2/c, and 3/c presses under 30". If the Company should buy a 4/c press under 30", the Union and the Company shall meet to determine manning at that time.

### FOUR COLOR PRESSES

(j)   Through 26" - one press operator, one feeder.

(k)   27" through 44" - 1st press operator, 2nd press operator (when operating with the reduced manning, the first press operator will receive an increase of $.32 per hour and the second press operator will receive an increase of $.20 per hour in addition to the hourly minimum rate specified for a 3-worker complement).

(l)   44" through 50" - 1st press operator, 2nd press operator, feeder (when operating with this reduced manning the first press operator will receive an increase of $.32 per hour, the second press operator will receive an increase of $.20 per hour, and the feeder will receive an increase of $.17 per hour in addition to the hourly rate specified for a 4-worker complement).

(m)   51" through 68" - two journey press operators, two journey feeder operators.

(n)   69" and over - two journey press operator, two journey feeder operators, one helper. The second feeder may be released after he/she makes ready and press is running.  The feeder may be assigned to other lithographic production jobs in the pressroom.

### FIVE COLOR PRESSES

(o)   Five color presses through 40" - 1st press operator, 2nd press operator, feeder (when operating with this reduced manning the first press operator will receive an increase of $.32 per hour, the second press operator will receive an increase of $.20 per hour  and the feeder will receive an increase of $.17 per hour in addition to the hourly rate specified for a 4-worker complement).

(p)   Five color presses 60" - two journey press operators, two journey feeder operators, one press helper.

(q)   Five color presses 77" and smaller - two journey press operators two journey feeder operators and one helper.

### *SIX COLOR PRESSES*

(r)   Six color presses 38" - two journey press operator, two journey feeder operators, one press helper.

(s)   Six-color presses 38" - two journey press operators, one journey feeder.  When operating as a four color press, two journey feeder operators and one helper.

(t)   Two color press - Two color presses through 60" may be operated without a press helper when operating with only one unit provided there shall be no layoff of employees and no member of the press crew shall be moved to another shift as a direct result of the implementation of this provision.  The reduction of the crew is subject to the approval of the press operator and the Shop Chair.  In addition, general workers or helpers assigned to the press crew shall work the same number of designated overtime hours during the regular work week (Monday through Friday) as the regular press crew.

(u)   Press wash-up crew shall consist of one feeder operator, press operator or one feeder operator apprentice and one press helper.

Section 2.  Variable Manning: Multi-color sheet-fed presses through 60" four color presses, when running less than the full number of units, may be manned according to the complement required on presses operating such number of units except that four color sheet-fed presses through 60" shall require not less than two color complement.

No crew member affected by such operation or other pressroom employee shall be laid off or switched to another shift as a result of such change.

Section 3.  In reference to Article 13 dealing with the complement of workers on two color presses, it is understood that workers on the floor around the press shall be considered as press helpers provided they are immediately available to the press crew.

Section 4.  The four color press referred to in Section 1 (m) above may be manned with one helper between two such four color presses.

Section 5.  The four color press (77" and over) referred to in this section when running two (2) colors may be operated without the second press operator.  There shall be no reduction in hourly rates on the first press operator or feeder operators.  The second press operator's rate on his/her transferred job shall not be less than that of a two color press operator.  He/She shall not be transferred to a different shift unless the two color operation is for three or more days' duration.  No pressroom help with permanent status as defined in Article 19, including the second press operator shall be laid off as a result of this operation; provided, however, this provision does not preclude the implementation of Articles 33 and 34 when applicable.

Section 6.  The five unit 25" x 38" rate shall prevail throughout the shift whenever the press operation begins as a five unit operation.

For the purpose of pay rates, the press shall be considered as operating as a five unit press when perforating, scoring or varnishing is included in the five unit operation.

The five color 38"-40" press may be operated with a first press operator and second press operator when operating with four or less units.

When four units or less are operating, the four color 38" rates shall prevail during the shift until five units are placed in operation.  During the shift the press may be operated without the general worker provided he/she is immediately available to the press crew.  No employee with permanent status in the pressroom shall be laid off as a result of such change in the press operation.

Section 7.  The five color 60" press as referred to in Section 1 (o) when running four (4) colors or less may be operated without the helper, provided they are immediately available to the press crew.  Varnish or stretch shall not be considered as colors for the purpose of determining the rate of pay.

Section 8.  Job Protection and Upgrading - Sheet Fed Equipment

(a)    The reassignment of feeders or helpers affected by reductions in manning on any multi-color press equipment to other job duties shall initiate the reduced complement hourly rates as outlined in the schedule "Minimum Hourly Scales for Journey Classifications" for press operators and feeders as outlined in the manning provision.

Said hourly rates will continue for the classifications outlined above although feeders or helpers may be reassigned to the press crew.

(b)    The Employer agrees that any feeder or helper affected by a reduction in manning shall not be laid off, terminated, or transferred to another shift except as provided for under Article 14.3 (c) [Shift Seniority], and shall retain the rate of pay for his/her classification including all future increases.  He/She may be reassigned to any other lithographic job in the plant pressroom.  In no case can another feeder or helper be laid off due to the reduction in complement.

This job protection language does not apply to feeders or helpers who are laid off due to lack of work. If the Employer chooses to use division of work, then the feeder or helper will share the division of work with the other employees.

Released feeders and helpers are covered for overtime by Article 15 [Overtime], Section 7.

(c)    If the feeder or helper leaves the job of his own accord the vacancy need not be filled.  If the feeder is promoted to an apprenticeship (or works as a permit worker on multi-color equipment), his/her vacancy need not be filled.  If the helper is promoted, the helper's job need not be filled.

(d)    Feeders and helpers released from their assignments on press complement as a result of manning reductions may be upgraded when a crew of two or more is required on equipment under the following conditions:

(1)    When the Employer purchases new and additional equipment (not replacement equipment).

(2)    When current equipment is required on additional shifts on a permanent basis.

(3)    When the Employer adds at least one journey worker from outside its shop at the time of the start of the new equipment or new shift (unless a qualified journey worker is not available).

(e)    Released helpers affected by a reduction in manning shall be assigned duties as set forth in Article 11 [Helper Duties], and such other duties as adequate floor help usually performs so long as the released helper is immediately available to the press crew.  The released helper is also covered by all the other provisions of this Article.

(f)    In case equipment is operated on a non-permanent basis, a permit situation can be implemented with agreement between the Company and the Union.  The parties intend to use released journey feeders and, under certain circumstances, released journey feeders and employees from outside the shop.  The methods, time and number of employees to be used will be decided upon

between the Company and the Union in which particular case, released journey feeders who are given a permit situation will be paid 40% of the difference between the employee's current rate and the journey rate.

(g)    In the case of the purchase of new and additional equipment (not replacement equipment) and in the case of the addition of shifts on present equipment, which requires a crew of only one employee, the Employer will be permitted to upgrade in the first such situation created, provided that the Employer agrees to add a journey worker from outside its shop in the next situation created (provided a qualified journey worker is available).

The Employer will thereafter upgrade, and hire on a proportionate basis as and if new situations are thereafter created on single crew equipment.

The parties further agree that the above method of upgrading can be amended by agreement of the Employer and the Union.  The parties agree to meet and discuss the upgrading system whenever it is deemed necessary.

A joint committee consisting of not more than four (4) Employer representatives and not more than four (4) Union representatives shall be appointed for the purpose of reviewing and correcting any violations of the agreement on feeder or helper job security.

## ARTICLE 14 - WORK WEEK

Section 1.  The regular work week shall consist of five (5) shifts of seven (7) hours beginning on Monday and ending on Friday of each week.

Effective March 1, 1985, the regular work week shall consist of five (5) shifts of seven and one-half (7½) hours beginning on Monday and ending on Friday of each week.

Section 2.  Shift Schedules.

(a)  First Shift - Shall not begin earlier than 6:00 a.m. nor later than 9:00 a.m.

(b)  Second Shift - Between 9:01 a.m. and 7:59 p.m.

(c)  Third Shift - Beginning on or after 8:00 p.m.

(d)  Any employee completing a shift shall be entitled to at least nine (9) hours off before being required to report on the next shift.

(e)  It is agreed that the changing of starting times of shifts will be held to a minimum.

Section 3.  Shift Assignment.

(a)    Where past practice included the assigning of personnel to their favored shift by length of service, such practice shall be maintained except by mutual consent.  Exception thereto may be made for break-in or training purposes for a period not to exceed thirty (30) working days.

(b)    When existing day shift openings occur, such position or positions shall be offered to the senior employee in classification.

Technagraphics                                          11
01/01/04 – 12/31/07